614 F.2d 1147
 William J. BOWE et al., Plaintiffs-Appellants,
Marion L. Fisher, Intervening Plaintiff-Appellant,
v.
BOARD OF ELECTION COMMISSIONERS OF the CITY OF CHICAGO et
al., Defendants- Appellees,
Timothy J. Fitzgerald and John A. Nudo, Jr., Intervening
Defendants-Appellees.
 No. 80-1129.
 United States Court of Appeals,
Seventh Circuit.
 Submitted Feb. 11, 1980.
Decided Feb. 13, 1980.
Rehearing and Rehearing In Banc Denied March 13, 1980.
 
 Robert Plotkin, John C. Hendrickson, Chicago, Ill., for plaintiffs-appellants.
 Peter B. Carey, Chicago, Ill., for defendants-appellees.
 Richard K. Means, Chicago, Ill., for intervening plaintiff-appellant.
 Andrew Raucci, Chicago, Ill., for intervening defendants-appellees.
 Jayne W. Barnard, Frances H. Krasnow, Jenner & Block, Chicago, Ill., for amicus curiae.
 Before FAIRCHILD, Chief Judge, and SWYGERT and SPRECHER, Circuit Judges.
 PER CURIAM.
 
 
 1
 This appeal has been briefed on an emergency basis, due to the time constraints faced by the defendants, the Chicago Board of Election Commissioners and its members, in arranging for ballots to be printed for the primary election to be held on March 18, 1980. Under Rule 34 of the Federal Rules of Appellate Procedure, we have decided this appeal without oral argument. Due to the emergency nature of the appeal, we have dispensed with the notice generally provided under Circuit Rule 14(f).
 
 
 2
 * A primary election will be held in the City of Chicago on March 18, 1980.[1] Pursuant to Ill.Rev.Stat. ch. 46, § 7-13, the defendants are responsible for certifying the names of candidates to be included on the ballot for this election.
 
 
 3
 Plaintiff Bowe and intervening plaintiff Fisher sought inclusion on the ballot as candidates for Democratic Ward Committeemen in the 43rd and 10th wards of the City of Chicago, respectively. The other plaintiffs are voters who desire to vote for Bowe in the election. The defendants propose to omit both candidate plaintiffs from the ballot because they did not submit sufficient valid signatures on their nominating petitions to meet the minimum requirements of Ill.Rev.Stat. ch. 46, § 7-10(i). This action was brought as a class action challenge to the constitutionality of the minimum signature requirement.
 
 
 4
 The plaintiffs sought preliminary injunctive relief to require the defendants to accept as valid the petitions of the candidate plaintiffs and those similarly situated, and to include their names on the ballot for the election. The district court denied preliminary injunctive relief, finding inter alia, insufficient likelihood of success on the merits. An injunction pending appeal was also denied.
 
 II
 
 5
 It is settled that on appeal from the denial of a preliminary injunction, the question before us is whether the district court judge abused his discretion. Kolz v. Board of Education, 576 F.2d 747 (7th Cir. 1978). The question before us, then, is not whether the plaintiffs may be entitled to injunctive relief after this case is heard on the merits in the district court. All that has been decided by the district court is that the plaintiffs are entitled to no injunctive relief prior to the hearing on the merits.[2] We conclude that the district court judge did not abuse his discretion in making that determination.
 
 III
 
 6
 A person seeking inclusion on the ballot as a candidate for Ward Committeeman must meet a number of requirements under the Illinois Election Code, Ill.Rev.Stat. ch. 46. Only the minimum signature requirement is at issue in this suit. Candidates for a variety of other offices are also included on the primary election ballot. The minimum signature requirements for most offices are set forth in Ill.Rev.Stat. ch. 46, § 7-10.[3] As can be seen, some minimum requirements are set in terms of percentages of primary electors from the political subdivision (including the requirement for ward committeeman), others in terms of absolute numbers, and a few in terms of combinations of a percentage and an absolute number.
 
 
 7
 The defendants publish an "Election Calendar" which lists minimum signature requirements for the various offices. According to that document, Bowe was required to file at least 1,295 signatures. In fact, he filed 1,663, but the defendants have determined that only 1,260 of them are valid. Fisher was required to file 1,518. He filed more than that number, but only 1,340 of the signatures were determined to be valid. As a result, neither Bowe nor Fisher will be included on the ballot.
 
 IV
 
 8
 The complaint of the plaintiffs calls into question the 10% minimum signature requirement applied to Ward Committeemen as compared to minimum requirements applied to other offices. In particular, the plaintiffs have placed some emphasis on the contrast between the offices of Ward Committeeman and State Central Committeeman. A Ward Committeeman serves only a single ward in the City of Chicago. As a result of the 10% minimum requirement, Democratic candidates must collect hundreds of valid signatures to qualify. The minimum ranges from a low of 834 in the 28th Ward to a high of 2,280 in the 13th Ward. By contrast, a State Central Committeeman serves an entire Congressional District, which allegedly contains "a population several times larger" than a ward in the City of Chicago. However, only 100 signatures are needed to qualify for the ballot.
 
 
 9
 This comparative approach is used in an attempt to bring this case within the teaching of Illinois State Board of Elections v. Socialist Worker's Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). A close analysis of the opinion in that case reveals that it does not directly control the present controversy. That case dealt with a special general election for Mayor of Chicago. It was shown that third parties and independents would have needed 25,000 signatures to be placed on the ballot for a statewide election. By contrast, when election was sought to an office in a political subdivision of the state, the statute required signatures of a minimum of 5% of the number of voters who voted in the previous election for offices within that political subdivision. The incongruous result was that in Chicago and Cook County (and only in those subdivisions), the 5% requirement was far in excess of the 25,000 requirement imposed for statewide offices.
 
 
 10
 The Supreme Court noted that two fundamental rights were implicated: the right to associate to advance political beliefs and the right of voters to vote effectively. As a result, the state was obliged to demonstrate a compelling interest to justify its classification. Id. at 184, 99 S.Ct. at 990.
 
 
 11
 The Court noted several legitimate interests which the state is entitled to assert. First, the state has an interest in regulating the number of candidates on the ballot.[4] Second, the state has an interest in assuring that the winner commands at least a strong plurality of votes without the necessity of a runoff election. As a result, the state may properly require a preliminary showing of a significant modicum of support before a candidate may appear on the ballot.[5] The Court emphasized, however, that the state may not pursue such interests through means that unnecessarily restrict constitutionally protected liberty, and it must use the least drastic means in achieving its end.[6]
 
 
 12
 The anomaly in the Socialist Worker's Party case was that the legislature had determined that 25,000 signatures served its interest in avoiding an overloaded ballot for statewide elections. But the state had advanced "no reason, much less a compelling one, why the State needs a more stringent requirement for Chicago." Illinois State Board of Elections v. Socialist Worker's Party, supra, 440 U.S. at 186, 99 S.Ct. at 991. Thus, the Court agreed with the district court and with this Court that Illinois had not adopted the least restrictive means in achieving its end.
 
 
 13
 The plaintiffs apparently take the position that the Socialist Worker's Party case stands for the broad proposition that a state may never impose a higher signature requirement for an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision. We cannot agree. As was true in Trafelet v. Thompson, 594 F.2d 623, 632 (7th Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979), we are obliged to read the Socialist Worker's Party opinion against the constitutional background of prior election cases.
 
 
 14
 First, it is established that the state's interests in preserving the integrity of its electoral process and regulating the number of candidates on the ballot are compelling. American Party of Texas v. White, 415 U.S. 767, 782 n. 14, 94 S.Ct. 1296, 1307, 39 L.Ed.2d 744 (1974), and cases cited. Thus substantial minimum signature requirements serve compelling state interests, and the only question is whether the specific percentage chosen serves the state's compelling interests in a reasonable manner.[7]
 
 
 15
 Second, and most crucial, is the fact that the Supreme Court has consistently taken an intensely practical and fact-oriented approach to deciding these election cases. In Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Court did not focus on Ohio's 15% signature requirement alone. Rather, the Court explored the tangled web of restrictions imposed which, taken together, made it virtually impossible for a third party to ever qualify for the ballot.[8] Id. at 25, 89 S.Ct. at 7. Similarly, in Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the Court explored the actual historical impact of the statute in reaching the conclusion that Georgia had not frozen the status quo, but rather had recognized the potential fluidity of American political life.[9]
 
 
 16
 The clearest example of the approach we have in mind is found in Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). In that case the Supreme Court vacated the judgment of a three-judge court and remanded the case for the development of a better factual record as to the actual impact of the signature requirement as it worked in conjunction with other aspects of California's election regulations. The ultimate question was said to be whether in the context of California politics, a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot. Id. at 742, 94 S.Ct. at 1285.
 
 
 17
 The plaintiffs ask us, as they asked the district court, to impose preliminary injunctive relief without the development of a factual record as to the circumstances, background and operation of the statute in question, relying on the Socialist Worker's Party case. We view that case as being an exception to the more common fact-oriented approach in this area, an exception warranted by the extreme and incongruous operation of the statute in question. Here, the plaintiffs have emphasized the 100 signature requirement for State Central Committeeman. Yet the statute reveals that the minimum requirement for statewide offices (including United States Senator) is 5,000 signatures, Ill.Rev.Stat. ch. 46, § 7-10(a), and the minimum signature requirement for President of the United States is 3,000, Ill.Rev.Stat. ch. 46, § 7-11. Thus, the same degree of incongruity found in Socialist Worker's Party is not present in this case. The case law provides no litmus paper test for finding violations of constitutional rights, and decision in this context is very much a matter of degree. Storer v. Brown, supra, 415 U.S. at 730, 94 S.Ct. at 1279.
 
 
 18
 One aspect of the defendants' view of this case is made clear by their brief and by the import of the evidence which they presented at the limited hearing held below. Their theory is that the disparity in signature requirements is justified, at least in part, by the differences in duties, responsibilities and importance of the various offices. It may also be significant that the Ward Committeeman is actually elected at the primary election. This fact might justify the imposition of some additional burden at the nominating stage. Cf. Jackson v. Ogilvie, 325 F.Supp. 864, 868 (N.D.Ill.) (Three-Judge Court), aff'd without opinion, 403 U.S. 925, 91 S.Ct. 2247, 29 L.Ed.2d 705 (1971). The existence and significance of these facts deserves development at a hearing on the merits.
 
 
 19
 Indeed, even the plaintiffs seem to recognize the importance of background facts and circumstances. In their brief (p. 3) they refer, without reference to the record, to the supposed real dynamics of this case as they relate to the control of patronage positions by the Cook County Democratic Organization. Further, (p. 13), they decry the lack of evidence as to the comparative functions and importance of Ward and State Central Committeemen in the Republican Party. It is precisely because of the lack of a fully developed record that we find no abuse of discretion in denying a preliminary injunction.
 
 
 20
 It may well be that the state has not chosen a reasonable signature requirement in serving its compelling interests. The magnitude of the 10% signature requirement gives cause for reflection on this point.[10] However, that determination will have to await a more complete consideration on the merits and facts of this case. The Clerk of this Court is directed to enter judgment AFFIRMING the order of the district court. The limited injunctive relief granted in our order of February 1, 1980 is hereby DISSOLVED.
 
 
 
 [1]
 While the election itself is generally referred to as the primary election, as to candidates for Ward Committeeman, it is the only election. The candidate receiving a plurality of votes is elected Ward Committeeman. Ill.Rev.Stat. ch. 46, § 7-8(b)
 
 
 [2]
 Of course, by the time this case is heard on its merits in the district court, the primary election will be past history. We note that this fact will not necessarily moot the case, since as to plaintiffs who may be candidates in the future, the issue involved is capable of repetition but evades review. Board of Election Commissioners v. Libertarian Party, 591 F.2d 22, 24 (7th Cir.), cert. denied, 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979); Briscoe v. Kusper, 435 F.2d 1046 (7th Cir. 1970)
 
 
 [3]
 Ill.Rev.Stat. ch. 46, § 7-10 provides in relevant part:
 Such petitions for nominations shall be signed:
 (a) If for a State office, or for delegate or alternate delegate to be elected from the State at large to a National nominating convention by not less than 5,000 nor more than 10,000 primary electors of his party.
 (b) If for a congressional officer or for delegate or alternate delegate to be elected from a congressional district to a national nominating convention by at least one-half of one per cent of the qualified primary electors of his party in his congressional district, except that for the first primary following a redistricting of congressional districts such petitions shall be signed by at least 600 qualified primary electors of the candidate's party in his congressional district.
 (c) If for a county office (including county board member and chairman of the county board where elected from the county at large), by at least one-half of one per cent of the qualified electors of his party cast at the last preceding general election in his county. However, if for the nomination for county commissioner of Cook County, then by at least one-half of one per cent of the qualified primary electors of his party in his county in the district or division in which such person is a candidate for nomination; and if for county board member from a county board district, then by at least one-half of one per cent of the qualified primary electors of his party in the county board district.
 (d) If for a city, incorporated town, town or village office to be filled by the electors of the entire city, incorporated town, town or village, by at least one-half of one per cent of the qualified primary electors of his party in the city, incorporated town, town or village; if for alderman, by at least one-half of one per cent of the voters of his party of his ward.
 (e) If for State central committeeman, by at least 100 of the primary electors of his party of his congressional district.
 (f) If for a candidate for trustee of a sanitary district in which trustees are not elected from wards, by at least one-half of one per cent of the primary electors of his party, from such sanitary district.
 (g) If for a candidate for trustee of a sanitary district in which the trustees are elected from wards, by at least one-half of one per cent of the primary electors of his party in his ward of such sanitary district, except that for the first primary following a reapportionment of the district such petitions shall be signed by at least 150 qualified primary electors of the candidate's ward of such sanitary district.
 (h) If for a candidate for judicial office, by at least 500 qualified primary electors of his judicial district or circuit, as the case may be.
 (i) If for a candidate for precinct committeeman, by at least 10 primary electors of his party of his precinct; if for a candidate for ward committeeman, by not less than 10% nor more than 16% (or 50 more than the minimum, whichever is greater) of the primary electors of his party of his ward; if for a candidate for township committeeman, by not less than 5% nor more than 8% (or 50 more than the minimum, whichever is greater) of the primary electors of his party in his township or part of a township as the case may be.
 (j) If for a candidate for State's Attorney to serve 2 or more counties, by at least one-half of one per cent of the primary electors of his party in the territory comprising such counties.
 (k) If for any other office by at least 10 primary electors of his party of the district or division for which nomination is made.
 For the purposes of this Section, when a petition is to be filed with the State Board of Elections, the number of primary electors shall be determined by taking the total vote cast, in the applicable district, for the candidate for such political party who received the highest number of votes, state-wide, at the last general election in the State. In other subdivisions of the State, municipality, or subdivision thereof, the number of primary electors shall be determined by taking the total vote cast for the candidate for such political party who received the highest number of votes in the State, subdivision thereof, or municipality or subdivision thereof, at the last general or municipal election within the same.
 See also Ill.Rev.Stat. ch. 46, § 7-11 (setting minimum signature requirements for President of the United States) and § 7-4 (defining "state office" as used in § 7-10(a) to include United States Senator).
 
 
 [4]
 Illinois State Board of Elections v. Socialist Worker's Party, supra, 440 U.S. at 185, 99 S.Ct. at 991. See also American Party of Texas v. White, 415 U.S. 767, 782 n. 14, 94 S.Ct. 1296, 1307, 39 L.Ed.2d 744 (1974). The Court has expressed concern for "laundry list" ballots which discourage voter participation and frustrate and confuse voters who do participate. Lubin v. Panish, 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974)
 
 
 [5]
 Illinois State Board of Elections v. Socialist Worker's Party, supra, 440 U.S. at 185, 99 S.Ct. at 991. See also American Party of Texas v. White, 415 U.S. 767, 782, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974); Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971)
 
 
 [6]
 Illinois State Board of Elections v. Socialist Worker's Party, supra, 440 U.S. at 185, 99 S.Ct. at 991. See also Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973)
 
 
 [7]
 Although not a separate issue in this case, we note that the legitimate interests of the state are served in a reasonable manner by removing from the ballot those who fail to meet the minimum requirement. If the minimum requirement itself is valid, then the state's interests are served by removing offending candidates from the ballot, because they have by definition not demonstrated a significant modicum of valid support. But cf. Richards v. Lavelle, No. 80-1123, (7th Cir. Feb. 13, 1980) (state's interest in maximum signature limitation not rationally served by removal from ballot)
 
 
 [8]
 The restrictions are detailed in n. 1 of the opinion, 393 U.S. at 25, 89 S.Ct. at 7, and in the separate opinion of Justice Douglas, 393 U.S. at 35-37, 89 S.Ct. at 12-13
 
 
 [9]
 Similarly, Judge Pell of this Court has called for analysis of the factual background of minimum signature requirements in Jackson v. Ogilvie, 325 F.Supp. 864 (N.D.Ill.) (Three-Judge Court) (Pell, J., dissenting), aff'd without opinion, 403 U.S. 925, 91 S.Ct. 2247, 29 L.Ed.2d 705 (1971). See also Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849 (1972), "(I)t is essential to examine in a realistic light the extent and nature of their impact on voters."
 
 
 [10]
 The Supreme Court has considered specific percentage requirements in Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (rejecting a 15% requirement accompanied by other restrictions); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (upholding a 5% requirement in the absence of other significant restrictions); American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (upholding a 2% requirement). The Supreme Court has never approved a minimum signature requirement higher than 5%. Storer v. Brown, supra, 415 U.S. at 739, 94 S.Ct. at 1283. Some comparative statistics are listed in Justice Harlan's concurring opinion in Williams v. Rhodes, supra, 393 U.S. at 47 n. 10, 89 S.Ct. at 19