**CITIZENS PARTY OF ILLINOIS, Bruce D. Kaplan, Louis Hirsch, individually and on behalf of all others similarly situated, Communist Party of Illinois, Richard L. Giovanoni, and Elizabeth Mitterer, individually and on behalf of all others similarly situated, Arthur L. Turner Party, Arthur L. Turner, and Delores Sims, individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**ILLINOIS STATE BOARD OF ELECTIONS, J. Phil Gilbert, Michael J. Hamblet, John W. Countryman, Richard A. Cowen, Carolyn R. Eyre, Joshua Johnson, John J. Lanigan, and Theresa M. Petrone, in their official capacities as members of the Illinois State Board of Elections, Defendants.**

**No. 82 C 4574.**

United States District Court, N. D. Illinois, E. D.

Aug. 6, 1982.

Frederick J. Sperling, Chicago, Ill., for plaintiffs.

James Scanlon, Gen. Counsel, Illinois State Bd. of Elections, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

Invoking 42 U.S.C. § 1983, plaintiffs seek an order temporarily enjoining defendants' proposed enforcement of Section 10–2 of the Illinois Election Code. For the reasons to follow, plaintiffs' motion for relief is granted.

### I.

Plaintiffs Citizens Party of Illinois, Communist Party of Illinois, and Arthur L. Turner Party are unincorporated associations principally headquartered in Chicago, Illinois. Each wishes to place on the November 1982 ballot a candidate for election to the Illinois House of Representatives. Each is a non-"established political party" as that term is defined under Illinois law.

Plaintiffs Bruce D. Kaplan, Richard L. Giovanoni, and Representative Arthur L. Turner are the proposed candidates of the Citizens Party, the Communist Party, and the Arthur L. Turner Party,[1] respectively. Plaintiff Louis Hirsch alleges that he is registered to vote and that he wishes to vote for Kaplan. Plaintiffs Elizabeth Mitterer and Delores Sims make similar allegations with respect to Giovanoni and Turner.

Defendant Illinois State Board of Elections is the administrative body charged

---

1. Kaplan and Giovanoni both intend to run in the Seventh Representative District. Turner, the incumbent in the old (pre-redistricting) Twenty-first District, wishes to run in the new (post-redistricting) Seventeenth District.

with enforcing the Illinois Election Code. The individually named defendants sit on and comprise the Board.

By virtue of the Election Code, "political groups" that poll more than 5% of the vote in a gubernatorial election are recognized as "established political parties." Ill.Rev.Stat. ch. 46, § 10–2. As such, their duly nominated candidates are automatically entitled to placement on the printed ballot in the next subsequent election. Id., § 10–1.[2] All other political groups must petition for this right. Specifically, a non-"established" organization that wishes to field candidates in some, but not all, of the races to be held in an election[3] must submit for each contest a petition "signed by qualified voters equaling in number not less than 5% of the number of voters who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area." Id., § 10–2. However, because the 1982 elections are the first to follow a redistricting, a special rule governs the plaintiffs' present access to the ballot: "For the first election following a redistricting of legislative districts, a petition to form a new political party in a legislative district shall be signed by at least 3,000 qualified voters of the legislative district." Id.[4] Defendants' interpretation of the latter provision lies at the heart of this controversy.

Prior to the November 1980 elections, Illinois contained 59 "legislative districts."

Each "district" elected one Senator and three Representatives. The votes for the latter office were cast on a cumulative basis. In 1980 the voters approved the so-called "Cutback Amendment" to the Illinois Constitution. This measure drastically altered the foregoing arrangement. Under the present law, Senators are still elected from 59 "Legislative Districts," but Representatives are now elected from 118 separate "Representative Districts," each district electing one Representative. Each "Legislative District" contains two "Representative Districts."

The Illinois Legislature has not yet completely amended the Election Code to reflect the changes brought forth by the "Cutback Amendment." This failure to act has generated considerable confusion as to the interrelationship between these two bodies of law. An Advisory Opinion prepared by the General Counsel to the State Board of Elections highlights the most glaring incongruity:

Section 10–2, when enumerating the various districts and political subdivisions for which new political parties can be formed, still refers to "legislative" districts but makes no reference to the recently-created representative districts. If read literally, Section 10–2 would thus permit the formation of a new political party for candidates for the office of State Senator, but would not permit ballot access to new political parties for candidates to the office of Representative.

Advisory Opinion No. 82–10, May 17, 1982, at 5. Recognizing that "such a denial of

---

**2.** Even if a political group is not an "established political party" with respect to all of Illinois, it may still be one with respect to a smaller portion of the state:

A political party which, at the last election in any congressional district, legislative district, county, township, municipality or other political subdivision or district in the State, polled more than 5% of the entire vote cast within such territorial area or political subdivision, as the case may be, has voted as a unit for the election of officers to serve the respective territorial area of such district or political subdivision, is hereby declared to be an "established political party" within the meaning

of this Article as to such district or political subdivision.

Ill.Rev.Stat., ch. 46, § 10–2. Such entities must follow the nominating procedures governing established parties when selecting the candidates they wish to run in their "established" areas.

**3.** Each of the plaintiff organizations meets this description. Section 10–2 sets forth different requirements for a "petition for the formation of a new political party throughout the State."

**4.** Independent candidates must submit similar petitions. Ill.Rev.Stat., ch. 46, § 10–3.

ballot access to Representative candidates of new political parties would probably render Section 10–2 constitutionally invalid," *id.,* the Advisory Opinion holds that the term "legislative district" should be construed to mean "either a Legislative District or a Representative District as the case may be." *Id.* at 6. The Opinion further addresses the "incidental issue" of how many signatures a new party's petition must contain in an election immediately following a redistricting:

> Having already concluded that the term "legislative" district, as it appears in Section 10–2, should be construed to refer to either a Legislative District or a Representative District, as the case may be, (as they exist in Article IV of the Constitution, as amended), it is my opinion that for purposes of the November 2, 1982, General Election, a new political party petition for candidates for either the office of State Senator or the office of Representative must contain at least 3,000 qualified voters of either the Legislative District or the Representative District, respectively.

*Id.* at 9.

Plaintiffs challenge the last interpretation as being unduly restrictive of their right to be on the ballot. They argue that a new party seeking the election of one of its members to the House is doubly burdened compared to a second party wishing to elect one of its members to the Senate. This is so because while both entities need 3,000 signatures, the party interested in the Senate seat can draw from an available pool of voters that is roughly twice as large. Plaintiffs further contend that this discrimination serves no rational purpose. For under the Board's construction of the statutory term "legislative district," in every election that does not follow a redistricting,

both Senate and House candidates are obligated to file signatures in an amount that equals the same percentage—five—of the votes cast in the preceding election held in the relevant electoral district. Thus, in every election but one, plaintiffs suffer no discrimination whatsoever, rendering the discrimination which does occur "freakish" and irrational. Plaintiffs conclude that the Equal Protection clause has been violated, and that, in the interest of parity, they should be required to submit only 1,500 signatures. They seek an order to this effect.

## II.

A preliminary injunction can issue only if:

(1) The plaintiffs have no adequate remedy at law and will be irreparably harmed if the injunction does not issue;

(2) The threatened injury to the plaintiffs outweighs the threatened harm the injunction may inflict on the defendant;

(3) The plaintiffs have at least a reasonable likelihood of success on the merits; and

(4) The granting of a preliminary injunction will not disserve the public interest.

*In re Uranium Antitrust Litigation,* 617 F.2d 1248, 1261 (7th Cir. 1980).

The evidence in the record clearly shows that the Turner plaintiffs will suffer irreparable injury if the requested injunction does not issue. On August 2, 1982, the last day for filing petitions, the Turner party submitted a petition that contained only 2,185 signatures. (Hudson Aff. at ¶ 2).[5] On August 4, Representative Turner testified to the harm his campaign had already suffered

---

**5.** The Hudson Affidavit was submitted by Kelvin Hudson, the Associate Director for the State Board of Elections.

In contrast to the Turner Party's position, the Citizens and Communist Parties submitted petitions containing 3,375 and 4,009 signatures

respectively. (Hudson Aff. at ¶ 2). During hearings conducted on August 3 (At this time, the Turner plaintiffs were not parties to this suit. They were added in an amended complaint filed the next day.), I expressed considerable doubt whether either the Citizens or the

as a result of his apparent failure to comply with Section 10–2. Numerous volunteers, he reported, have left his camp and have joined forces with other candidates who are more assured of a position on the ballot. The uncertainty as to his status has also obstructed the planning of fund-raising events, and has delayed the start of a door-to-door canvass Turner plans to make throughout the Seventeenth Representative District. The latter project is especially important because the bulk of the voters in the Seventeenth District have never (due to redistricting) been represented by Turner in the past. Representative Turner further testified that many political action committees are scheduled to decide upon their endorsements and campaign contributions in the near future. A candidate who is certain not to be on the ballot stands virtually no chance of receiving such largesse. It thus seems clear that if preliminary relief is not granted, the Turner plaintiffs will suffer injuries which are irreversible and which cannot be redressed in an action at law.[6]

Defendants' threatened injury, moreover, is slight in comparison to the above harms.

Communist Party had suffered any injury justifying immediate injunctive relief. To be sure, the signatures obtained by these plaintiffs remained subject to challenge at the behest of "any legal voter" in the Seventh Representative District. Ill.Rev.Stat., ch. 46, § 10–8. As a result, it could not be said with certainty that these parties had actually garnered the 3,000 signatures demanded by the State. However, everything was speculative. The policy against unnecessary constitutional adjudication counseled strongly against making an expedited ruling on such a basis.

In response to this line of argument, counsel asserted that if relief were not immediately forthcoming, the original plaintiffs would have no alternative but to operate under the assumption that the 3,000 signature requirement was valid. These plaintiffs would, as a result, have to contest vigorously each and every challenge that might be made to their petitions. Most importantly, they would have to begin preparing for these contests immediately. By contrast, the argument continued, if plaintiffs were told that only 1,500 signatures were required, they could be less concerned with the validity of signatures and more concerned with campaigning. Their time and money could be spent on political speech rather than litigation.

I remained skeptical whether these factually unsupported assertions justified the immediate invalidation of a state statute governing an area "the Constitution largely entrusts to the States." *Kusper v. Pontikes,* 414 U.S. 51, 57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973). The addition of the Turner plaintiffs mooted these concerns. *Cf. Village of Arlington Hts. v. Metro. Housing Dev.,* 429 U.S. 252, 264 n.9, 97 S.Ct. 555, 562 n.9, 50 L.Ed.2d 450 (1977) (if one plaintiff has standing to complain, a court need not analyze the standing of the remaining plaintiffs).

**6.** There is a theoretical possibility that after all challenges to the Turner petitions are resolved, *see* note 5, *supra,* fewer than 1,500 of the ten-dered signatures may remain valid. Accordingly, there is a chance that the Turner plaintiffs will not ultimately reap the benefits of the relief requested in the complaint. While this scenario may initially seem to be grounds for concern, *cf. Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *South East Lake View Neighbors v. Department of Housing and Urban Development,* 685 F.2d 1027, No. 81–2104 (7th Cir. July 28, 1982), such a hypothetical possibility does not by itself warrant a denial of relief.

In the first place, the irreparable injuries cited in the text *will* be redressed by the requested order, at least during the pendency of the challenge period. An injury that is sufficient for justiciability purposes need not be the same as the constitutional deprivation attacked in the complaint. *See Duke Power Co. v. Carolina Environ. Study,* 438 U.S. 59, 78–81, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978).

Moreover, the evidence establishes that the Turner petitions most likely contain in excess of 1,500 valid signatures anyway. Representative Turner testified that his organization made a *determined effort to obtain signatures only* from voters registered in the Seventeenth District, the sole class of individuals eligible to sign Turner's petitions. Representative Turner informed the Court that, on the basis of his extensive political experience, he had concluded that it is much preferable to submit a few carefully obtained signatures rather than a great number of names whose collection has not been adequately controlled. Thus, Turner eschewed soliciting in shopping centers and other public areas in which voters from many different Districts often congregate. Turner instead sent his circulators door-to-door throughout the Seventeenth District. Each was required to have with him or her a poll sheet listing the names of the voters registered in the District. The circulators were instructed to allow an individual to sign the petition only if that person's name appeared on the poll sheet. At staff meetings, the circulators received in-

Under state law, defendants need not certify any candidate for ballot placement until September 2, 1982. Past experience in ballot access cases indicates that appellate review can be had before the latter deadline arrives. *See Bowe v. Bd. of Election Com'rs of City of Chicago,* 614 F.2d 1147 (7th Cir. 1980) (case submitted on February 11, 1980 and decided on February 13, 1980); *Richards v. LaVelle,* 620 F.2d 144 (7th Cir. 1980) (same).

The granting of the injunction will also not disserve the public good. Decrees which promote "the continued availability of political opportunity", *Clements v. Fashing,* —— U.S. ——, 102 S.Ct. 2836, 2844, 73 L.Ed.2d 508 (1982) (plurality opinion), are clearly in the public interest. Three of the four requisites for a preliminary injunction have thus been satisfied. Plaintiffs' entitlement to relief turns on whether they have shown a reasonable likelihood of success on the merits.

### III.

It is fundamental that constitutional questions must be avoided whenever possible. *E.g., Siler v. Louisville & Nashville Railroad Co.,* 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909). Before leaping into an equal protection analysis, it is thus necessary to consider the possibility that, properly construed, Illinois law itself obligates the submission of only 1,500 signatures.

In his Advisory Opinion reaching the contrary conclusion, the Board's General Counsel read the pertinent language in Section 10–2 quite literally. He substituted the phrase "Legislative Districts or Representative Districts" for the statutory term "legislative districts" and concluded that the 3,000 signature requirement applied in both the Senate and the House contexts. He does not appear to have considered the *de facto* disparate impact of such an interpretation.

This logic stands in stark contrast to the analysis underlying the predicate conclusion that the term "legislative" need not be read literally and can in fact refer to both "Legislative" and "Representative" races. The General Counsel reached the latter judgment by drawing upon several principles of construction—primarily, that statutes should be read to avoid constitutional problems, and to reflect a consistent legislative purpose. Advisory Opinion, *supra,* at 5–7. Yet both of these doctrines could equally support a conclusion that only 1,500 signatures need be submitted by entities in plaintiffs' situation. Obviously, such a reading of Section 10–2 would moot plaintiffs' constitutional claim. Moreover, by eliminating the freakishly-occurring, disparate burden placed on House candidates, this reading would grant the statute more cohesiveness than it presently has under the Board's contrary approach.

As a federal judge, though, it is not my function to decide what Illinois law should be. My function is solely to determine how the Illinois courts would interpret Section 10–2 under these circumstances. Ordinarily, I would abstain on this question. The issue is "unclear," especially since the Illinois judiciary has never directly addressed this specific point. *See Railroad Commission of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Unfortunately, abstention is not a realistic option. Given the pendency of the upcoming election, there is simply no time for the abstention machinery to run its course.

I must therefore decide whether the Illinois courts would uphold the Board's construction of Section 10–2. My criticisms of this analysis notwithstanding, the fact remains that the statute's plain language specifies 3,000 signatures and never once contains a reference to the figure 1,500. It can thus hardly be said that the Board's position is untenable. The conclusion

---

formation regarding various other election laws as well. In light of these facts, it seems substantially probable that at least 1,500 (or a little more than two-thirds) of the submitted signatures are valid. No greater showing can be demanded of plaintiffs. *See Duke Power Co. v. Carolina Environ. Study, supra,* 438 U.S. at 74–78, 98 S.Ct. at 2630–2633.

reached in the Advisory Opinion also finds support in the manner the Illinois Legislature recently amended Section 8–8 of the Election Code to conform to the "Cutback Amendment." Section 8–8 outlines the ballot requirements in "established political party" primaries. As amended, the statute provides that candidates of such parties must satisfy a 1% signature requirement when running for either a House or a Senate seat, except that in the first primary following redistricting, each must obtain 600 signatures. The post-"cutback" Legislature thus deliberately imposed a unitary signature requirement in the first election following redistricting. The Board has done nothing more.

Moreover, the Illinois courts may adopt the Board's position simply because it is the Board's position:

> While a court is not formally bound by the administrative decision as to legal effect of statutory words, it should give that conclusion great weight, using it as a substantial factor in its own construction of the statute. The importance of the agency's interpretation derives from the legislative decision to remedy harms through an administrative body. In using this method the legislature acknowledges the existence of complex problems requiring a variety of solutions and the need for an efficiency and expertise unavailable from specific, static laws.

*Ranquist v. Stackler,* 55 Ill.App.3d 545, 550, 13 Ill.Dec. 171, 175–76, 370 N.E.2d 1198, 1202–03 (1st Dist. 1977), *cert. denied,* 439 U.S. 926, 99 S.Ct. 309, 58 L.Ed.2d 318 (1978) (citations omitted). For the above reasons, I am unable to conclude, for purposes of this motion, that the cited Advisory Opinion inaccurately interprets Section 10–2. Plaintiffs' constitutional claims must be reached.

## IV.

It can scarcely be denied that Section 10–2 restricts the constitutional rights of the plaintiffs:

> Restrictions on access to the ballot burden two distinct and fundamental rights, "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."

*Illinois State Board of Elections v. Socialist Workers,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979) (quoting *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968)). Yet it is equally clear that the State of Illinois has legitimate reasons to condition access to the ballot on a candidate's showing of a "significant modicum of support." *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971); *accord, e.g., American Party of Texas v. White,* 415 U.S. 767, 782 n.14, 94 S.Ct. 1296, 1307 n.14, 39 L.Ed.2d 744 (1974). A contrary rule that "permit[ted] every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process." *Lubin v. Panish,* 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974). A ballot that contains many candidates also increases the possibility of a fractured vote. The Supreme Court has "expressed concern for the States' need to assure that the winner of an election 'is the choice of a majority, or at least a strong plurality of those voting, without the expense and burden of runoff elections.'" *Illinois State Board of Elections v. Socialist Workers, supra,* 440 U.S. at 185, 99 S.Ct. at 990 (quoting *Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972)); *accord, Lubin v. Panish, supra,* 415 U.S. at 712, 94 S.Ct. at 1318.

The question in this case, however, is not whether Illinois has the authority to impose *some* conditions on access to the ballot. The question is rather whether the particular scheme Illinois has chosen falls within the limits of its constitutional discretion. Because "fundamental rights" are at stake, Illinois is not entitled to distribute rights to

access in whichever way it chooses. *See, e.g., Illinois State Board of Elections v. Socialist Workers, supra.*

The decision in *Socialist Workers* strongly indicates that the challenged provisions in Section 10–2, as construed by the State Board of Elections, are unconstitutional. In that case, the Supreme Court held that Illinois could not constitutionally enact an election scheme in which

> an independent candidate or new political party in Chicago, a city with approximately 718,937 voters eligible to sign nominating petitions for the mayoral election in 1977, had to secure over 10,000 more signatures on nominating petitions than an independent candidate or new party in state elections, who had a pool of approximately 4.5 million eligible voters from which to obtain signatures.

*Id.,* at 440 U.S. at 183–84, 99 S.Ct. at 989–90 (footnotes omitted). The Court's reasoning ran as follows:

> The Illinois Legislature has determined that its interest in avoiding overloaded ballots in statewide elections is served by the 25,000-signature requirement. Yet appellant has advanced no reason, much less a compelling one, why the State needs a more stringent requirement for Chicago.

*Id.* at 186, 99 S.Ct. at 991. This same line of argument, plaintiffs maintain, dictates a decision in their favor. Here, as in *Socialist Workers,* Illinois "has advanced no reason, much less a compelling one" justifying a requirement that burdens candidates for the House twice as much as candidates for the Senate in one election every ten years.

To be sure, *Socialist Workers* must be read with caution. It must be analyzed "against the constitutional backdrop of prior election cases," *Bowe v. Bd. of Election*

*Com'rs of City of Chicago,* 614 F.2d 1147, 1151 (7th Cir. 1980); *accord, Trafelet v. Thompson,* 594 F.2d 623, 632 (7th Cir.), *cert. denied,* 444 U.S. 906, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979), and broad generalizations must be eschewed:

> The plaintiffs apparently take the position that the *Socialist Worker's Party* case stands for the broad proposition that a state may never impose a higher signature requirement for an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision. We cannot agree.

*Bowe v. Bd. of Election Com'rs of City of Chicago, supra,* 614 F.2d at 1151. Plaintiffs cannot, and do not, take issue with this statement. They concede that certain disparities might be justifiable, that "the differences in duties, responsibilities and importance of various offices," *id.* at 1152, might warrant a differential in the relative signature requirements demanded by the state. Plaintiffs' argument is simply that these contentions are irrelevant. Regardless of what the state *might* be able to justify in some *other case,* the fact remains that *no* justifications have been put forth *here.* Judgment must therefore be in plaintiffs' favor.

Defendants' rejoinders are unpersuasive. Neither in their written response to plaintiffs' motion nor in oral argument have they articulated any reason justifying the discrimination about which plaintiffs complain. Defendants have instead taken the position that they need not offer a rationalization because "plaintiffs' contentions do not rise to constitutional dimensions." (Response Memorandum at 14). This argument derives from three subordinate claims: first, that there is no constitutional "rule of proportionality," [7] second, that classifications between elective offices are not a

---

7. Under such a "rule," all candidates (or, at least, all new party and independent candidates) would be required to submit signatures equal in amount to a uniform percentage of the pool of voters from which they solicit.

In a similar vein, defendants have suggested at times that there is no equal protection issue in this case because the statute is "facially neutral"; it requires the same number of signatures from candidates for both the House and the Senate. This contention fails because Sec-

federal constitutional concern; and finally, that plaintiffs have failed to establish that the 3,000 signature requirement is a substantial impediment to the ballot. None of these contentions are appropriate bases for decision.

First of all, plaintiffs are not advocating a "rule of proportionality." They have not argued that they are entitled to relief solely because defendants' interpretation of Section 10–2 imposes upon them a signature requirement which is higher in percentage terms than the one placed upon Senatorial candidates. Plaintiffs instead stress that the above disparity occurs freakishly, only once every ten years. This infrequency justifies, I believe, an inference that few, if any, state interests are served by the challenged discrimination under any circumstances. Thus, the Court need not adopt a "rule of proportionality" in order to place on the defendants the burden of coming forward with some explanation for the state's behavior.

Defendants' second argument also fails. Whether or not there is a general federal interest in the manner a state differentiates between its elective offices, see *Clements v. Fashing*, —— U.S. ——, ——, 102 S.Ct.

2836, 2849, 73 L.Ed.2d 508 (1982) (Stevens, J., concurring in part and concurring in the judgment), there is clearly such an interest when the differentiation affects the constitutional rights of candidates and voters. *Id.* at 2843–48 (plurality opinion) (subjecting such restrictions to federal equal protection review); *id.* at 2850–54 (Brennan, J., dissenting) (same).

Finally, plaintiffs are not obligated to prove that the 3,000 signature requirement is onerous in, of and by itself.[8] They are also entitled to relief if they can show that they have been forced to endure a burden which is irrational in a *comparative* sense. The *Socialist Workers* Court, for example, struck down on comparative grounds a statutory requirement which had been upheld when analyzed in isolation. *See Jackson v. Ogilvie*, 325 F.Supp. 864, 868 (N.D.Ill.), *aff'd. mem.*, 403 U.S. 925, 91 S.Ct. 2247, 29 L.Ed.2d 705 (1971).[9]

In sum, it was defendants' burden at least to articulate a justification for the discrimination attacked in the complaint. In light of their failure to do so, I hold that plaintiffs have established a reasonable likelihood of success on the merits.[10]

The decision in *Bowe v. Bd. of Election Com'rs of City of Chicago, supra,* is consist-

tion 10–2, as interpreted by defendants, is *not* facially neutral. It mandates that Senatorial candidates obtain 3,000 signatures from a "Legislative District," yet it limits a Representative candidate's solicitation to a "Representative District." The doctrine of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) has no relevance in this suit.

8. Though plaintiffs alleged at oral argument that the challenged restriction poses an "insuperable burden" to access, they offered no proof on this issue. In any event, I do not understand plaintiffs' complaint to center on this contention.

9. The *Socialist Workers* Court carefully distinguished *Jackson.* It did not overrule the earlier precedent. *Illinois State Board of Elections v. Socialist Workers, supra,* 440 U.S. at 181, 99 S.Ct. at 988.

10. In *Clements v. Fashing, supra,* Justice Stevens argued that the plurality had upheld a classification for which essentially no justification had been offered:

Justice Rehnquist['s plurality opinion] has demonstrated that there is a "rational basis" for imposing the burdens at issue on the offices covered by §§ 19 and 65. He has not, however, adequately explained the reasons, if any, for imposing those burdens on some offices but not others. With respect to the latter inquiry, the plurality is satisfied to note that the State may approach its goals "one step at a time." In my judgment, this response is simply another way of stating that there need be no justification at all for treating two classes differently during the interval between the first step and the second step—an interval that, of course, may well last forever.

*Id.,* 102 S.Ct. at 2850 (Stevens, J., concurring in part and concurring in the judgment). Justice Stevens found this outcome acceptable because of his view that there is no "federal interest in requiring a State to define the benefits and burdens of different elective state offices in any particular manner." *Id.* at 2849. Justice Stevens explicitly rejected the propriety of Justice Rehnquist's analysis in other contexts. *Id.* at 2850. The four dissenters, of course, agreed.

ent with this result. Plaintiffs there sought inclusion on the Democratic Party primary ballot as candidates for Ward Committeeman in two wards of the City of Chicago. Each plaintiff argued that it was unconstitutional for his access to be conditioned on a requirement that his petitions be signed by 10% "of the primary electors of his party of his ward." Ill.Rev.Stat., ch. 46, § 7–10. Plaintiffs established that this percentage figure translated into an actual requirement of 834 to 2,280 signatures, depending on the ward involved. They contrasted this range with the 100 signature requirement levied on candidates for State Central Committeeman. The latter individuals could solicit signatures in a much larger and more populous area—an entire Congressional District. Arguing that these rules operated in combination to discriminate against them unconstitutionally, plaintiffs sought an order enjoining the defendants to accept the petitions they had submitted.

The District Court refused to grant the order and the Seventh Circuit affirmed, ruling that "because of the lack of a fully developed record ... we find no abuse of discretion in denying a preliminary injunction." *Id.*, 614 F.2d at 1153. The Court of Appeals refused the plaintiffs' invitation "to impose preliminary injunctive relief *without* the development of a factual record as to the circumstances, background and operation of the statute in question." *Id.* at 1152 (emphasis in original). In this case, the factual record is similarly scant. Nevertheless, an order in plaintiffs' favor remains appropriate.

First of all, the *Bowe* panel merely held that the District Court had acted within its discretion by denying the injunction. The

Court of Appeals never stated that it would have been an abuse of discretion had the lower court ruled the other way.

Moreover, the discrimination attached in *Bowe* differed qualitatively from that at issue here. Plaintiffs in *Bowe* challenged a disparity that surfaced in every primary election. By contrast, the discrimination in this case is, to repeat, freakish; it reoccurs only once every decade, a feature which accentuates its seeming irrationality and which undercuts any asserted justification based on alleged differences between the offices affected. The same was not true in *Bowe*.[11]

Indeed, the classification challenged here bears a closer resemblance to that found in *Socialist Workers,* not *Bowe.* The relevant statute provided in *Socialist Workers* that candidates for statewide office needed 25,-000 signatures. As originally passed, the statute further required that these signatures be geographically dispersed: At least 200 voters in each of 50 different counties had to be among the 25,000 signers. This requirement was declared unconstitutional in *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). Illinois then amended its statute so that no more than 13,000 of the needed signatures could come from one county. This provision was also invalidated. *Communist Party of Illinois v. State Board of Elections,* 518 F.2d 517 (7th Cir.), *cert. denied,* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). The law which came before the Court in *Socialist Workers* was thus a shadow of its former self. Illinois had attempted to balance its relatively lenient absolute number requirement for state candidates with a geographical requirement that did not burden candidates in municipal elections. However, after the

---

*Id.* at 2850–54 (Brennan, J., dissenting). A majority of the *Clements* Court thus reaffirmed that in circumstances such as those present here, the State bears the burden of bringing forth some justification for its distinctions.

**11.** It is perhaps also relevant that the *Bowe* Court dealt with provisions governing the election of partisan, rather than public, officers. *Cf. Ripon Society v. National Rep. Party,* 525

F.2d 567 (D.C.Cir.1975) (en banc), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976); *Bode v. National Dem. Party,* 452 F.2d 1302 (D.C.Cir.1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972); *see generally* L. Tribe, *American Constitutional Law,* § 13–25 (1978).

*Moore* and *Communist Party* decisions, this balance no longer existed. The disparate burdens placed on the *Socialist Workers* plaintiffs were thus in no sense a "considered product of a legislature," *id.,* 440 U.S. at 191, 99 S.Ct. at 993 (Rehnquist, J., concurring in the judgment), and the Court was clearly troubled by the prospect of letting stand a discrimination that could be explained by nothing more than "historical accident." *Id.* at 187, 99 S.Ct. at 991 (majority opinion); *id.* at 189, 99 S.Ct. at 993 (Stevens, J., concurring in part and concurring in the judgment); *id.* at 191, 99 S.Ct. at 993 (Rehnquist, J., concurring in the judgment); *see also Wilson v. Firestone,* 623 F.2d 345, 346 (5th Cir.) (per curiam), *cert. denied,* 449 U.S. 984, 101 S.Ct. 400, 66 L.Ed.2d 247 (1981). The Court's sensitivity to this point was understandable, for while legislatures are presumed to act in a constitutional manner, *see, e.g., Clements v. Fashing, supra,* 102 S.Ct. at 2843, no such rule has evolved with respect to "historical accidents." This fact has relevance because, as in *Socialist Workers,* the discrimination challenged in this case was never expressly ordained by the Illinois Legislature. Rather, it is the product of an Advisory Opinion promulgated by an administrative official trying to fill in the gaps caused by legislative inaction. *See* Part I, *supra.* This was simply not the case in *Bowe.*

Finally, and most significant, the defendants in *Bowe* attempted to justify the discrimination which was challenged. They argued, *inter alia,* that Ward Committeemen and State Central Committeemen served different roles and that these differences were rationally reflected in the disparate signature requirements Illinois had mandated. In support of this claim, defendants presented evidence at a "limited hearing" held on the motion for preliminary relief. *Id.,* 614 F.2d at 1152. The Court of Appeals' conclusion, based on a review of this record, was that enough had been shown to justify the lower court's decision in defendants' favor. Because of defendants' showing, the District Court had acted well within its discretion when it had concluded that the plaintiffs had failed to establish a likelihood of success on the merits. Here, by contrast, the issue is not even close. Defendants have put nothing in the record which even remotely justifies the discrimination plaintiffs have attacked. Plaintiffs are entitled to their injunction.

## V.

For the reasons stated in this opinion, defendants are enjoined, pending the outcome of this litigation, to accept as valid, for purposes of the November 1982 election, petitions for a new political party in a Representative District which are signed by at least 1,500 qualified voters of such Representative District and which meet all other requirements imposed by law.