Ed H. SMITH, Michael Rembert, Danny K. Davis, Herbert Payne, Allan Streeter, Julius Hammond, Dorothy Tillman, Lovie Copeland, George H. Eddings and John Davis, Plaintiffs,

v.

The BOARD OF ELECTION COMMISSIONERS FOR the CITY OF CHICAGO and Michael E. Lavelle, James R. Nolan and Corneal A. Davis, in their capacities as members of the Board of Election Commissioners for the City of Chicago, Defendants.

Edward W. GJERTSEN, Stuart Schulman, Joseph W. Smith, Kenneth A. Lavand, Herman A. Schell, Jr., Patricia A. Hans, William T. Margalus and Dominic Costanzo, Plaintiffs,

v.

The BOARD OF ELECTION COMMISSIONERS FOR the CITY OF CHICAGO and Michael E. Lavelle, James R. Nolan and Corneal A. Davis, in their capacities as members of the Board of Election Commissioners for the City of Chicago, Members of the State Board of Elections, Richard A. Cowen, Carolyn R. Eyre, J. Phil Gilbert, Michael J. Hamblet, Joshua Johnson, John J. Lanigan, Theresa M. Petrone and Norma J. Shapiro, in their capacities as members of the State Board of Elections, and Stanley T. Kusper, Jr., in his capacity as County Clerk of Cook County, Illinois, Defendants.

Nos. 84 C 0148, 84 C 0560.

United States District Court, N.D. of Illinois, E.D.

March 9, 1984.

C. Richard Johnson, Steven R. Gilford, Robert G. Perkins, Isham, Lincoln & Beale, Chicago, Ill., for plaintiffs in No. 84 C 0148.

Michael Levinson, Michael LaVelle, Board of Election Commissioners, Chicago, Ill., Franklin J. Lunding, Jr., Charles M. Biggam, Biggam, Cowman, Marquardt & Lunding, Chicago, Ill., for defendants in No. 84 C 0148.

Russell J. Stewart, Park Ridge, Ill., for plaintiffs in No. 84 C 0560.

Lavelle, Nolan & Davis, Michael Levinson and Franklin J. Lunding, Michael E. Lavelle, Board of Election Comm., Chicago, Ill., for Bd. of Election Comm.

Franklin S. Schwerin, Joseph L. Ponsetto and Michael C. Moses, Richard M. Daley, State's Atty. of Cook County, Chicago, Ill., for Stanley Kusper, Jr.

James M. Scanlon, James Tenuto, and Neil Hartigan, Atty. Gen., State of Ill., Chicago, Ill., for State Bd. of Elections, Cowen, Eyre, Gilbert, Hamblet, Johnson, Lanigan, Petrone, Shapiro.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

### I.

A primary election will be held in the City of Chicago on March 20, 1984 ("the election"). At such time candidates for the office of Ward Committeeman who receive a plurality of votes will be elected as Ward Committeemen. Ill.Rev.Stat. ch. 46, § 7–8(b). Two lawsuits have been filed: one on behalf of certain Democratic candidates (84 C 0148) and the other on behalf of certain Republican candidates (84 C 0560). Plaintiffs Dorothy Tillman and George H. Eddings sought inclusion on the ballot as candidates for the office of Democratic Ward Committeeman in the 3rd and 18th Wards of the City of Chicago, respectively. Plaintiffs Edward W. Gjertsen, Herman A. Schell, Jr., Joseph W. Smith and William T. Margalus sought inclusion as candidates for the office of Republican Ward Committeeman in the 40th, 19th, 45th and 11th Wards of the City of Chicago. The other plaintiffs are voters who desire to vote for the candidate plaintiffs in the election.[1] One of the defendants in these cases, the Board of Election Commissioners of the City of Chicago ("the City Board") is responsible for certifying the names of candidates to be included on the ballot for the March 20, 1984 election. The City Board certified to the Cook County Clerk, defendant Kusper, that the plaintiff candidates will not appear on the ballot for the election as candidates for Ward Committeeman because they failed to submit sufficient valid signatures on their nominating petitions to meet the minimum requirements of Ill.Rev.Stat. ch. 46, § 7–10(i). Plaintiffs sued the City Board, Kusper and the Illinois State Board of Elections ("the State Board"), challenging the constitutionality of the minimum signature requirement set forth in Ill.Rev.Stat. ch. 46, § 7–10(i).

On March 7, 1984, we ruled on plaintiffs' motions for preliminary injunctive relief and required that the City Board include certain plaintiff candidates' names on the ballot for the election.[2] Set forth herein are the supporting reasons for our ruling granting plaintiffs' motion for prelimi-

---

1. Plaintiffs Copeland and Davis also circulated nominating petitions on behalf of Tillman and Eddings, while Schulman, Lavand, Hans and Costanzo signed nominating petitions for the Republican plaintiffs.

2. Also pending is the City Board's motion to dismiss Count I in 84 C 0148. Count I involves three plaintiff candidates, Ed H. Smith, John Davis and Allan Streeter, and three voters who circulated nominating petitions on their behalf.

Defendants have presented evidence that the names of Ed H. Smith, Davis and Streeter have been certified to appear on the ballot, and they thus claim that Count I is moot. While these candidates are not entitled to injunctive relief placing them on the ballot, dismissal of Count I is inappropriate. In *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Supreme Court reviewed ballot restrictions despite the fact that the candidate appeared on the ballot and the election had already been

nary injunction in 84 C 0148 and granting in part and denying in part plaintiffs' motion for preliminary injunction in 84 C 0560.[3]

Persons seeking inclusion on the ballot as Ward Committeeman candidates must meet several requirements under the Illinois Election Code, Ill.Rev.Stat. ch. 46. Controversy in the present matter centers around the minimum signature requirements set forth in § 7–10.[4] Section 7–10 provides that

petitions for nominations shall be signed

\* \* · \* \* \* \*

held. Despite these facts, the case was not moot. *Id.* at 784, 103 S.Ct. at 1567 n. 3. *See also Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974). Accordingly, the City Board's motion to dismiss Count I is denied. It is so ordered.

3. In the hearing on this matter, counsel for plaintiffs Tillman and Eddings indicated that they seek relief no broader than the listing of their names on the ballot. We therefore decline to consider the request in their preliminary injunction motion for an order requiring the City Board to place on the ballot all Ward Committeeman candidates who obtained signatures of five percent of the primary electors of their party of their wards.

4. According to Ill.Rev.Stat. ch. 46, § 7–10,
 [t]he name of no candidate for nomination, or State central committeeman, or township committeeman, or precinct committeeman, or ward committeeman or candidate for delegate or alternate delegate to national nominating conventions, shall be printed upon the primary ballot unless a petition for nomination has been filed in his behalf as provided in this Article in substantially the following form:

 \* \* \* \* \* \*

 Such petitions for nominations shall be signed:
 (a) If for a State office, or for delegate or alternate delegate to be elected from the State at large to a National nominating convention by not less than 5,000 nor more than 10,000 primary electors of his party.
 (b) If for a congressional officer or for delegate or alternate delegate to be elected from a congressional district to a national nominating convention by at least one-half of one per cent of the qualified primary electors of his party in his congressional district, except that for the first primary following a redistricting of congressional districts such petitions shall be signed by at least 600 qualified primary electors of the candidate's party in his congressional district.
 (c) If for a county office (including county board member and chairman of the county board where elected from the county at large), by at least one-half of one per cent of the qualified electors of his party cast at the last preceding general election in his county. However, if for the nomination for county commissioner of Cook County, then by at least one-half of one percent of the qualified

primary electors of his party in his county in the district or division in which such person is a candidate for nomination; and if for county board member from a county board district, then by at least one-half of one per cent of the qualified primary electors of his party in the county board district. In the case of an election for county board member to be elected from a district, for the first primary following a redistricting of county board districts or the initial establishment of county board districts, then by at least one-half of one percent of the qualified electors of his party in the entire county at the last preceding general election, divided by the number of county board districts, but in any event not less than 25 qualified primary electors of his party in the district.
 (d) If for a municipal or township office by at least one-half of one per cent of the qualified primary electors of his party in the municipality or township; if for alderman, by at least one-half of one per cent of the voters of his party of his ward. In the case of an election for alderman or trustee of a municipality to be elected from a ward or district, for the first primary following a redistricting or the initial establishment of wards or districts, then by one-half of one percent of the total number of votes cast for the candidate of such political party who received the highest number of votes in the entire municipality at the last regular election at which an officer was regularly scheduled to be elected from the entire municipality, divided by the number of wards or districts, but in any event not less than 25 qualified primary electors of his party in the ward or district.
 (e) If for State central committeeman, by at least 100 of the primary electors of his party of his congressional district.
 (f) If for a candidate for trustee of a sanitary district in which trustees are not elected from wards, by at least one-half of one per cent of the primary electors of his party, from such sanitary district.
 (g) If for a candidate for trustee of a sanitary district in which the trustees are elected from wards, by at least one-half of one percent of the primary electors of his party in his ward of such sanitary district, except that for the first primary following a reapportionment of the district such petitions shall be signed by at least 150 qualified primary electors of the candidate's ward of such sanitary district.

(i) If for a candidate for precinct committeeman, by at least 10 primary electors of his party of his precinct; if for a candidate for ward committeeman, by not less than 10% nor more than 16% (or 50 more than the minimum, whichever is greater) of the primary electors of his party of his ward; if for a candidate for township committeeman, by not less than 5% nor more than 8% (or 50 more than the minimum, whichever is greater) of the primary electors of his party in his township or part of a township as the case may be.

\* \* \* \* \* \*

(k) ... the number of primary electors shall be determined by taking the total vote cast for the candidate for such political party who received the highest number of votes in such political subdivision or district at the last regular election at which an officer was regularly scheduled to be elected from that subdivision.

Ill.Rev.Stat. ch. 46, § 7–10.

The City Board published an "Election Calendar" for 1984, which listed minimum signature requirements for a variety of offices.[5] According to the Election Calendar, Tillman was required to submit 2,448 signatures on her nominating petition; while she presented 3,483 signatures, the City Board concluded that only 2,105 of those signatures were valid.[6] Tillman thus submitted

---

(h) If for a candidate for judicial office, by at least 500 qualified primary electors of his judicial district or circuit, as the case may be.

(i) If for a candidate for precinct committeeman, by at least 10 primary electors of his party of his precinct; if for a candidate for ward committeeman, by not less than 10% nor more than 16% (or 50 more than the minimum, whichever is greater) of the primary electors of his party of his ward; if for a candidate for township committeeman, by not less than 5% nor more than 8% (or 50 more than the minimum, whichever is greater) of the primary electors of his party in his township or part of a township as the case may be.

(j) If for a candidate for State's Attorney or Regional Superintendent of Schools to serve 2 or more counties, by at least one-half of one per cent of the primary electors of his party in the territory comprising such counties.

(k) If for any other office by at least 10 primary electors of his party of the district or division for which nomination is made.

**5.** The City Board also sets a maximum number of signatures which may be submitted on nominating petitions. Ill.Rev.Stat. ch. 46, § 7–10(i) allows a candidate to submit signatures or no more than sixteen percent of the primary electors in a ward. Plaintiffs claim that this maximum requirement compounds the impairment of their voting, ballot access and associational rights.

In *Richards v. Lavelle*, 620 F.2d 144 (7th Cir. 1980), the Seventh Circuit held that a rational basis exists for the sixteen percent maximum rule. *Id.* at 147. But removal from the ballot as a sanction for violation of the maximum rule was irrational and violated plaintiffs due process rights. *Id.* at 149. In the present case, there is no evidence that any of the plaintiff candidates were removed from the ballot for exceeding the sixteen percent rule. Considera-tion of plaintiffs' claim concerning the maximum rule is therefore unnecessary.

We also note that the Seventh Circuit contrasted *Lavelle*, a maximum signature requirement case, with a minimum signature requirement case

[i]n minimum requirement cases, of course, a compelling state interest is required, but it is obvious that the removal sanction rationally serves the legitimate interest of the state in assuring that the candidate has demonstrated a significant modicum of support. If the minimum requirement itself is valid, then removal rationally serves the state's interest by preventing one who has not demonstrated sufficient support from gaining a place on the ballot.

620 F.2d at 149 n. 4. Notwithstanding this guidance concerning the appropriate standard of review, the Supreme Court established the analytical framework for our inquiry in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

**6.** Section 7–13 establishes a procedure through which one may object to nomination petitions for ward committeemen:

The board of election commissioners in cities of 500,000 or more population having such board, shall constitute an electoral board for the hearing and passing upon objections to nomination petitions for ward committeemen.

Such objections shall be filed in the office of the county clerk not less than 81 days prior to the primary. The objection shall state the name and address of the objector, who may be any qualified elector in the ward, the specific grounds of objection and the relief requested of the electoral board. Upon the receipt of the objection, the county clerk shall forthwith transmit such objection and the petition of the candidate to the board of election commissioners. The board of election com-

signatures of 8.6% of the primary electors in her ward. Eddings filed 3,094 signatures, 2,631 of which were found valid. Eddings submitted signatures of 9.9% of the primary electors in his ward. He was required, however, to offer 2,647 signatures. The City Board determined that all of the other plaintiff candidates failed to submit sufficient signatures.[7] As a result,

none of the plaintiff candidates will be included on the ballot in the upcoming election.

## II.

As an initial matter, defendants strenuously assert that an evidentiary hearing must be held on plaintiffs' motion for a preliminary injunction.[8] In support

---

missioners shall forthwith notify the objector and candidate objected to the time and place for hearing hereon. After a hearing upon the validity of such objections, the board shall, not less than 74 days prior to the date of the primary, certify to the county clerk, its decision stating whether or not the name of the candidate shall be printed on the ballot and the county clerk in his certificate to the board of election commissioners shall leave off of said certificate the name of the candidate for ward committeeman that the election commissioners shall decree shall not be printed on the ballot. However, the decision of the board of election commissioners is subject to judicial review as provided in Section 10–10.1.

7. Statistics concerning the remaining plaintiff candidates are as follows:

| Name | Signatures Required | Signatures Filed | Percentage |
|---|---|---|---|
| Edward W. Gjertsen | 1,822 | 880 | 4.8% |
| Herman A. Schell, Jr. | 2,810 | 1,000 | 3.6% |
| Joseph W. Smith | 3,174 | 2,042 | 6.4% |
| William T. Margalus | 2,058 | 2,469 | 12.0% |

Plaintiffs' complaint does not indicate the number of valid signatures Margalus submitted. In the hearing on this matter, Margalus' counsel indicated that the City Board determined that Margalus failed to submit signatures constituting ten percent of the primary electors of his party of his ward.

8. The City Board has raised several additional arguments which we consider *seriatim.*

### Laches

The City Board claims that plaintiffs have long been aware of the signature requirement in Ill. Rev.Stat. ch. 46, § 7–10(i), but that they unreasonably delayed in filing suit. The City Board adds that they have been prejudiced by this delay and claim that the doctrine of laches should apply to bar consideration of plaintiffs' claims.

Defendants would have to show prejudice to them, as well as lack of diligence on the part of plaintiffs, to establish the defense of laches. *Cannon v. University of Chicago,* 710 F.2d 351, 359 (7th Cir.1983). Prejudice involves a demonstration of detrimental change in the condition or relations of the parties. *Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946).

The City Board rejected Tillman's and Eddings' nominating petitions during January of 1984. They sought leave to join this lawsuit on February 3, 1984. Both Tillman and Eddings submitted signatures in excess of the statutory maximum, as did Margalus. Margalus joined this case in late February; his nominating petitions were rejected in January of 1984. These plaintiffs could not be expected to challenge the signature requirement prior to learning whether the signatures they filed would be accepted and their names added to the ballot.

Neither Gjertsen, Joseph W. Smith nor Schell filed signatures in excess of the statutory minimum. They filed their nominating petitions in mid-December. Prior to this point, they may well have expected to be able to comply with the statute and obtain signatures in excess of the statutory maximum. None of these three defendants can be charged with a prolonged and inexcusable deferment of action to enforce their rights. *Citation Cycle Co. v. Yorke,* 693 F.2d 691, 695 (7th Cir.1982). In any event, defendants have failed to demonstrate a prejudiced change in the condition or relations of the parties. Furthermore, they make no arguments with regard to applying laches to claims of the plaintiff voters. Because the parties did not unnecessarily delay in bringing suit, and since our grant of injunctive relief provides defendants with alternative means to comply with our order, in an effort to avoid an unduly chaotic effect upon the election, this case is distinguishable from *Fishman v. Schaffer,* 429 U.S. 1325, 97 S.Ct. 14, 50 L.Ed.2d 56 (Marshall, Circuit Justice 1976).

### Rule 19

The City Board claims that persons who filed objections to plaintiff candidates' nominating petitions pursuant to Ill.Rev.Stat. ch. 46, § 7–13 are indispensable parties to this action. We disagree. Fed.R.Civ.P. 19(a) provides that

[a] person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the

of their argument, they cite *Bowe v. Board of Election Commissions,* 614 F.2d 1147 (7th Cir.1980), where the Seventh Circuit affirmed the denial of preliminary injunctive relief by the district court. The district court in *Bowe* held an evidentiary hearing should be held on the preliminary injunction motion concerning the identical ten percent signature requirement for Ward Committeeman candidates presently at issue.

Plaintiffs' complaint, like the complaint in *Bowe,* calls the ten percent requirement into question *as compared* to minimum signature requirements applied to other state offices. For example, State Committeeman candidates need only obtain 100 signatures from a legislative district to appear on the ballot. Candidates to be delegates at national party nominating conventions need only obtain signatures of one-half percent of primary electors in a congressional district. But since differences in duties, responsibilities and the importance of the various offices may justify the disparity in signature requirements, the Seventh Circuit held that the existence and significance

of these facts required development at a hearing on the merits, *id.* at 1153. As the Court observed,

> [i]t may well be that the state has not chosen a reasonable signature requirement in serving its compelling interests. The magnitude of the 10% signature requirement gives cause for reflection on this point. However, that determination will have to await a more complete consideration on the merits and facts of this case.

*Id.* (footnote omitted).

 The instant case is distinguishable from *Bowe* on a number of grounds. First, we believe that sufficient facts have been developed to warrant the granting of preliminary injunctive relief. In the hearing held on this matter, the parties were ordered to address the "factual question" as to whether there are any differences in duties between the offices of Ward Committeeman and Township Committeeman which would justify disparate signature requirements for nominating petitions.[9]

---

persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Complete relief may be awarded absent the joinder of parties who objected to plaintiff candidates' nominating petitions. None of the objectors claims an interest in the instant litigation, and their absence poses no risk of inconsistent obligations upon the present parties. *See also Tillman v. City of Milwaukee,* 715 F.2d 354, 357–58 (7th Cir.1983).

*Exhaustion*

According to the City Board, plaintiffs' failure to raise their claims before the City Board in state court bars them from filing the present action. The City Board asserts that this is so because of the doctrines of res judicata and collateral estoppel. We believe that the City Board's position is more aptly characterized as an exhaustion argument. It is well settled that parties seeking redress for deprivation of their constitutional rights need not exhaust state judicial or administrative remedies. *Patsy v. Florida Board of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 1222, 39 L.Ed.2d 505 (1974). Application of the doctrine of abstention, moreover, would be unwarranted. Abstention is appropriate where a statute is susceptible of a construction by the state judiciary that would avoid the necessity of reaching a

federal constitutional issue. *Kusper v. Pontikes,* 414 U.S. 51, 54–55, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973). Defendants offer no argument that ch. 46, § 7–10(i) might be susceptible of such an interpretation; the statute itself is clear on its face. We therefore decline to abstain from deciding the present matter. *See also, City Investing v. Simcox,* 633 F.2d 56, 59–60 (7th Cir.1980); *Wynn v. Carey,* 582 F.2d 1375, 1380 (7th Cir. 1978); *Smith v. Cherry,* 489 F.2d 1098, 1102 (7th Cir.1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974).

*Immunity*

Finally, the City Board asserts that defendants are entitled to absolute judicial immunity, and that this Court thus lacks jurisdiction over the present matter under 42 U.S.C. § 1983. While state election officials may indeed be entitled to some form of immunity from damages liability, *Briscoe v. Kusper,* 435 F.2d 1046, 1057–58 (7th Cir.1970), we need not resolve this issue at the present stage of the instant litigation.

9. Unlike the defendants in *Bowe,* defendants have offered no evidence justifying this disparate signature requirement. The failure of the State Board to offer evidence in support of a minimum signature requirement was termed the "most significant" factor entitling plaintiffs to injunctive relief in *Citizens Party v. Illinois State Board of Elections,* 546 F.Supp. 1050, 1060 (N.D.Ill.1982).

From this evidence, we have concluded that no significant differences exist between these offices.[10] As our analysis will reveal, we hold that Ill.Rev.Stat. ch. 46, § 7–10(i) is unconstitutional on its face. Second, we emphasize the narrow character of the preliminary injunctive relief in this case, in contrast to permanent injunctive relief.[11] Our focus at the present stage of this matter requires considering whether plaintiffs have demonstrated a reasonable likelihood of success on the merits. Finally, we cannot help but note the proximity of the election at issue. Holding an evidentiary hearing would require a substantial time period; and the requisite delay might cause plaintiffs to be denied entirely the preliminary relief they seek. A prompt ruling on this matter would also maximize defendants' opportunity to make the alterations mandated by this order prior to the election and to appeal our decision to the Seventh Circuit, should they so choose. We therefore conclude that at this time an additional evidentiary hearing in this matter is neither required by law nor is it in the interests of prompt and fair resolution of the issues in light of the inherent time restraints; nor do we believe that such evidentiary hearing would be helpful to the Court.

The decision whether to grant or deny preliminary injunctive relief lies within the discretion of the district court. *American Hospital Association v. Harris,* 625 F.2d 1328, 1330 (7th Cir.1980). Such discretion, however, is measured against four prerequisites: (1) whether plaintiff has a reasonable likelihood of success on the merits; (2) whether plaintiff faces irreparable injury and lacks an adequate remedy at law; (3) whether the threatened harm to plaintiff outweighs the harm the injunction may cause defendants; and (4) whether granting of the injunction will not disserve the public interest. *Shaffer v. Globe Protection, Inc.,* 721 F.2d 1121 at 1123 (7th Cir.1983); *NFE International,*

*Ltd. v. General Resource Corp.,* 558 F.Supp. 1137, 1139 (N.D.Ill.1983).

Plaintiffs will suffer irreparable injury if an injunction does not issue. At present, none of the plaintiff candidates' names will appear on the ballot. Plaintiffs' rights to vote, their rights to associate to advance political beliefs and their rights to appear as candidates in an election are presently imperiled. As the Seventh Circuit has observed, even the temporary deprivation of First Amendment rights constitutes irreparable harm in an injunction suit. *Citizens for a Better Environment v. City of Park Ridge,* 567 F.2d 689, 691 (7th Cir.1975). Plaintiffs will therefore suffer irreversible injuries which could not be redressed by an action at law absent a grant of preliminary relief. *Citizens Party of Illinois v. Illinois State Board of Elections,* 546 F.Supp. 1050, 1053–54 (N.D.Ill.1982) (requirement of 3,000 signatures on petitions for a new political party in a Representative District unconstitutional; preliminary injunction granted).

Defendants, however, will also be harmed by the grant of an injunction. The election is but a few days away. At a hearing on this matter, defendants presented testimony concerning the many steps necessary to place plaintiffs' names on the ballot. But any threatened hardship to defendants is outweighed by the serious injury plaintiffs face. Granting an injunction, moreover, would not disserve the public interest. An injunction adding candidates to the ballot would promote political opportunity. Several courts have struck down state laws which operated to limit ballot access. *E.g., Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (filing deadline for statement of candidacy and nomination petitions); *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (filing fee for County Supervisor candidacy); *Communist Party v. State Board of Elections, State of Illinois,* 518 F.2d 517 (7th Cir.1975), *cert. de-*

---

**10.** *See* section VI *infra.*

**11.** This opinion should not be construed to preclude the granting of a full evidentiary hearing when the permanent injunction issue is decided.

*nied,* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975) (signature requirement of 25,000 voters, not more than 13,000 from any one county); *Greaves v. State Board of Elections of North Carolina,* 508 F.Supp. 78 (E.D.N.C.1980) (signature requirement of ten percent of voters in last gubernatorial election; filing deadline). Thus, an injunction in the instant case would clearly comport with the public interest. Since three of the four requisites for preliminary injunctive relief have been satisfied, we must consider whether plaintiffs have demonstrated a reasonable likelihood of success on the merits.

## III.

Under Ill.Rev.Stat. ch. 46, § 7–10(i), candidates for Township Committeeman need only present signatures of five percent of the primary electors in a township to appear on the ballot. Ward Committeeman candidates, in contrast, need ten percent. Section 7–10(i) thus establishes a legislative classification based upon geography: candidates from the City of Chicago must submit a greater percentage of signatures on their nominating petitions than candidates in townships. Such disparate legislative treatment of candidates and voters raises questions under the Equal Protection Clause of the Fourteenth Amendment.[12] *Baum v. Lunding,* 535 F.2d 1016, 1018 (7th Cir.1976); *Bohus v. Board of Election Commissioners,* 447 F.2d 821, 822 (7th Cir. 1971).

Legislative classifications based upon geography that restrict access to the ballot have come under close constitutional scrutiny. In *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), the Court struck down a law which discriminated against the residents of populous counties at the expense of rural residents. The statute at issue required signatures of 25,-000 electors, including the signatures of two hundred qualified voters from each of at least fifty counties. Under such a law, the electorate in forty-nine counties containing 93.4% of registered voters could not form a new political party and appear on the ballot. But 25,000 of the remaining 6.6% of voters distributed among the fifty-three remaining countries could gain access to the ballot. The statute was therefore

> contrary to the constitutional theme of equality among citizens in the exercise of their political rights. The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.

*Id.* at 818–19, 89 S.Ct. at 1496. In *Communist Party v. State Board of Elections,* 518 F.2d 517 (7th Cir.1975), *cert. denied,* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975), the Seventh Circuit followed *Moore* in holding unconstitutional a statute requiring political parties seeking ballot access to submit petitions with 25,000 signatures, not more than 13,000 of which could be from a single county. The state's interests in limiting the number of candidates, avoiding frivolous candidacies and minimizing voter confusion could not be realized by discriminatorily diminishing the power of voters in urbanized counties. *Id.* at 522. Voters from urban counties could not, under the statute, place their candidates on the ballot.

More recently, the Supreme Court reviewed a statute which imposed disparate signature requirements for statewide office as opposed to offices of political subdivisions of the state, *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). The effect of the statute was to require new or independent candidates for office in the City of Chicago to submit substantially more signatures to gain access to the ballot than a candidate for statewide office. Because the state could

---

**12.** In addition to examining ballot access requirements under the Equal Protection Clause of the Fourteenth Amendment, courts have evaluated such restrictions with reference to the rights of free speech and association under the First and Fourteenth Amendments. *E.g., Jen-* *ness v. Fortson,* 403 U.S. 431, 439–40, 91 S.Ct. 1970, 1975, 29 L.Ed.2d 554 (1971) (a five percent signature requirement violated neither the Equal Protection Clause nor the rights of free speech and association under the First and Fourteenth Amendments).

advance no reason for applying a more stringent requirement to Chicago candidates, the Court found the signature requirement unconstitutional. *Id.* at 187, 99 S.Ct. at 983. It is with these cases in mind that we undertake review of the legislative classifications established in ch. 46, § 7–10(i)[13]

Before examining the signature requirement in further detail, we must, as a threshold matter, ascertain the appropriate standard of review to be applied in considering the minimum signature requirement. There is no consensus among the parties on this point. Plaintiffs argue that the signature requirement, because it threatens the associational rights of voters, merits strict judicial review and can be sustained only if it serves a compelling state interest. The State Board denies that the statute at issue merits "strict scrutiny," and would have this Court apply a balancing test recently announced in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983).

Determining the standard of review to be applied in cases involving restrictions upon ballot access is no simple matter. In *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), the Supreme Court declared that ballot access restrictions burden two fundamental rights, the right of individuals to associate for the advancement of political beliefs and the right of voters to cast their votes effectively. As a result, the states must demonstrate a compelling interest to justify any statutory classifications in this area. *Id.* at 184, 99 S.Ct. at 990. *See also Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1968). But the court has also noted that candidate restrictions require a realistic appraisal of the extent and nature

of their impact on voters. *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972). Thus, there is no "litmus paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). Ballot access restriction cases necessarily involve factual inquiries; in considering signature requirements, for example, the Court has examined whether

> a reasonably diligent independent candidate [can] be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot.... Past experience will be a helpful, if not unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.

*Id.* at 742, 94 S.Ct. at 1285. *See also Mandel v. Bradley,* 432 U.S. 173, 177–78, 97 S.Ct. 2238, 2241, 53 L.Ed.2d 199 (1977).

As a plurality of the Court recently observed, *Clements v. Fashing,* 457 U.S. 957, 964, 102 S.Ct. 2836, 2844, 73 L.Ed.2d 508 (1982), there has been a departure from traditional equal protection analysis in two types of ballot access cases—those involving classifications based on wealth, *e.g., Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), and those imposing burdens on new or small political parties or independent candidates. *E.g., American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). *See also Trafelet v. Thompson,* 594 F.2d 623, 632 (7th Cir.1979), *cert. denied,* 444 U.S. 906, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979) (strict scrutiny has been applied to classifications which burden candidates or voters identifiable by economic status or political preferences). Neverthe-

---

**13.** We reject defendants' suggestion that the aforecited cases, as well as other ballot access cases, are distinguishable from the present matter because the latter does not involve attempts by a new or independent party and its candidate to appear on the ballot. Restrictions upon access to the primary ballot raise issues similar to those appearing in other ballot access cases,

thus requiring application of the same basic legal analysis. Note, *Developments in the Law—Elections,* 88 Harv.L.Rev. 1111, 1180–81 (1975); *see also Richards v. Lavelle,* 620 F.2d 144, 149 (7th Cir.1980); *Bowe v. Board of Election Commissioners,* 614 F.2d 1147, 1151–52 (7th Cir.1980).

less, restrictions which fail to fall into the above two patterns do not automatically merit traditional equal protection analysis, which requires only that distinctions be drawn in such a way that they bear a rational relationship to a legitimate state end. *Clements*, 457 U.S. at 965, 102 U.S. at 2845.

More recently, the Court avoided placing a label upon the mode of analysis to be used in evaluating ballot access restrictions. Constitutional examination of a state's election laws requires a court to

> first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983). This standard rather than "strict scrutiny" or the "rational basis test" will guide our present inquiry. It bears emphasizing that *Anderson v. Celebrezze* also requires us to consider whether the state has open to it a less drastic means of satisfying its legitimate interests. If there exists a less burdensome alternative through which a state might reach its goals, the state cannot use a legislative scheme that broadly stifles the exercise of fundamental personal liberties. *Id.* at 805–06, 103 S.Ct. at 1578–79; *Kusper v. Pontikes*, 414 U.S. 51, 59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973).

## IV.

■ The magnitude of the rights at issue in this case is beyond question. The right to vote, *per se*, is not constitutionally protected. *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 35 n. 78, 93 S.Ct. 1278, 1298 n. 78, 36 L.Ed.2d 16 (1973). But voting implicates fundamental rights which are integral to a democratic society. These include the right to associate with others for the common advancement of political beliefs and ideas. *Kusper v. Pontikes*, 414 U.S. 51, 56–57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973). The right of qualified voters to associate with the political party of their choice through voting is central to our basic constitutional freedoms. *Id.; Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968).

■ Candidates' rights are also at stake in this matter. Candidacy has not been treated as a fundamental right, *Bullock v. Carter*, 405 U.S. 134, 142–143, 92 S.Ct. 849, 855, 31 L.Ed.2d 92 (1972). But excluding candidates from the ballot in an election restricts *voters'* freedom of association, since an election campaign both provides a forum for the expression of political viewpoints and a focus for like-minded citizens. *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983). Voters can express their political preferences only through candidates. As a result, the right of a party or individual to a place on the ballot is intertwined with the rights of voters and entitled to protection. *Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974).

Contrary to defendants' assertions, the ten percent signature requirement has a substantial impact upon the rights we have identified. Plaintiff Schell, for example, was unable to meet the requirement of 2,810 signatures for placement on the ballot in the 19th Ward and will not appear as a candidate for Ward Committeeman. It is undisputed, moreover, that no other candidates for Republican Ward Committeeman will appear on the ballot in the 19th Ward. As a result, Republican voters in this ward will be denied an opportunity whatsoever to vote for the candidate of their choice, notwithstanding Schell's interest in appear-

ing on the ballot.[14] This imperils the political process in the 19th Ward, for election campaigns provide a means for disseminating ideas as well as attaining political or party offices. *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 186, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979). The sole method whereby a Republican Ward Committeeman could be elected in the 19th Ward is through a write-in process, but a write-in candidate would be required to receive a number of votes equal to the number of signatures required on a nominating petition. Ill.Rev.Stat. ch. 46, § 7–59.[15]

Plaintiff Gjertsen submitted 880 signatures. He was required to submit 1,822 signatures, since his party's candidate in the last general election, Bernard A. Epton, received 18,220 votes in the 40th Ward. This is so despite the fact that only 341 voters in the 40th Ward sought Republican ballots in the 1983 mayoral primary. Plaintiff Tillman needed 2,448 signatures on her nominating petitions, since Mayor Harold Washington received 24,472 votes in the 3rd Ward in the 1983 general election. The number of signatures Tillman had to present constitutes eleven percent of the voters who took Democratic ballots in the 1983 primary and twenty-seven percent of the Democratic primary vote in the 1982 primary. In 1980, voters cast 2,235 votes for Democratic Ward Committeeman in the 3rd Ward. But this year, Tillman was required to submit more signatures in her nomination petition than there were votes cast the last time an election for this office took place.

Both plaintiffs and defendants submitted historical data concerning past Ward Committeeman elections. Analysis of past experience is clearly relevant. *Storer v. Brown,* 415 U.S. 724, 742, 94 S.Ct. 1274, 1285, 39 L.Ed.2d 714 (1974). Between 1928 to 1936, the signature requirement for Ward Committeeman nomination petitions was five percent of primary elections. Plaintiffs assert that approximately ninety-six out of one hundred-fifty, or sixty-four percent, of these elections were contested, *i.e.,* more than one candidate received over fifty votes. In 1940, after the signature requirement was increased to ten percent, only twelve elections were contested. From 1940 to 1980, plaintiffs assert that an average of eleven percent of Ward Committeeman elections were contested.

Moreover, the City Board has provided evidence of five races in the past ten Ward Committeeman elections where no candidates whatsoever appeared on the ballot. From 1944 to 1980, the City of Chicago held five hundred elections for Ward Committeeman, ten elections in each of fifty wards. Defendants' statistics indicate that in only eighty of those elections, or sixteen percent, did more than one candidate ap-

**14.** A list of Ward Committeeman candidates for the March 20, 1984 election shows that no Republican candidates in the 2nd, 43rd and 50th Wards have been certified. Nor have any Democratic Ward Committeeman candidates been certified in the 7th Ward.

**15.** According to the pertinent portion of Ill.Rev. Stat. ch. 46, § 7–59,

[n]otwithstanding any other provisions of this Section, a person whose name was not printed on the primary ballot as a candidate for nomination for or election to an office, is not nominated for or elected to that office as a result of a write-in vote at the primary unless the number of votes he received equals or exceeds the number of signatures required on a petition for nomination for that office.

Gjertsen, Schell, Joseph W. Smith and Margalus challenge the above-cited write-in provision as well, claiming that it violates their rights to due process and equal protection. The adequacy of a write-in procedure is open to some doubt, for "[t]he realities of the election process ... strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot." *Lubin v. Panish,* 415 U.S. 709, 719 n. 5, 94 S.Ct. 1315, 1321 n. 5, 39 L.Ed.2d 702 (1974); *see also Williams v. Rhodes,* 393 U.S. 23, 37, 89 S.Ct. 5, 14, 21 L.Ed.2d 24 (1968) (Douglas, J., concurring). None of the parties focused upon the constitutionality of the write-in provision. There is no evidence in the record concerning its present effect nor its historical impact upon voters and candidates. Preliminary injunctive relief concerning ch. 46, § 7–59 would not be appropriate absent a showing that plaintiffs' claim concerning this statute is likely to succeed on the merits. We emphasize, however, that we express no opinion as to the constitutionality of Ill.Rev. Stat. ch. 46, § 7–59.

pear on the ballot for Democratic Ward Committeeman.

We therefore conclude that the signature requirement will substantially injure plaintiffs' right to vote, to associate to advance political beliefs and to appear as candidates in elections. None of the plaintiff candidates will appear on the ballot in the election. None of the plaintiff voters will be able to vote for the candidate of their choice. This year, as in past elections, many elections involve but a single candidate, and a few races have no candidates at all. Thus, the rights of voters in general have also been injured.

### V.

Defendants identify a number of interests they seek to further by a ten percent signature requirement: avoiding voter confusion, minimizing the size of the ballot, eliminating frivolous candidacies and requiring a showing of a modicum of support in order to have a candidate's name appear on the ballot. The State Board also claims that the signature requirement serves the interests of political parties, and that dilution of the ten percent signature requirement would "make it more likely that a candidate who is elected would not be truly representative of the ideas of the party."

The Constitution largely entrusts the administration of the electoral process to the states. Art. I, § 2; Art. II § 1; *Kusper v. Pontikes*, 414 U.S. 51, 57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973). There is no doubt that elections must be substantially regulated to insure the orderly functioning of the democratic process. *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). According to the Illinois Supreme Court, the general purpose of Ill.Rev.Stat. § 7–10 and other related provisions of the Election Code is "to provide an orderly procedure whereby qualified persons seeking public office may enter primary elections." *Lewis v. Dunne*, 63 Ill.2d 48, 52, 344 N.E.2d 443, 446 (1976).

It is important to insure that ballots remain within manageable, understandable limits, to avoid the fragmentation of voter choice. *Lubin v. Panish*, 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974). A procedure which regulates the filing of frivolous candidacies serves these important goals. *Id.* Regulating the number of candidates also avoids clogging the election machinery of a state, minimizes voter confusion and assures that the winner of an election is the choice of a majority of plurality of the votes, thus avoiding runoff elections. *Bullock v. Carter*, 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972). Requiring a preliminary showing of a significant modicum of support before placing a candidate's name on the ballot is an important state interest which helps avoid confusion and frustration of the democratic process. *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971).

█ . While aspects of a state's election code may well affect voting and associational rights, the above state regulatory interests are generally sufficient to justify reasonable, non-discriminatory restrictions. *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 (1983). There can thus be no doubt that the avoiding of voter confusion, minimizing ballot size, eliminating frivolous candidacies and requiring a modicum of support prior to placing a candidate's name on the ballot are important state interests. Whether these interests justify both the disparate signature requirement at issue and the accompanying burden it places upon plaintiffs' rights, requires further analysis.

### VI.

Section 7–10(i) establishes disparate signature requirements for the offices of Ward Committeeman and Township Committeeman. While a ten percent signature requirement might indeed serve the above state interests, we must consider the relationship between these interests and a statute which imposes a more difficult burden upon voters and candidates in the City of Chicago than upon township votes and candidates.

Evidence in the record indicates that no significant differences exist between the offices of Ward Committeeman and Township Committeeman which might explain the disparate signature requirement.[16] The Election Code treats both offices virtually identically; both are elected by a plurality of votes every four years. Ill.Rev. Stat. ch. 46, § 7–8(b). Holders of both offices comprise the County Central Committee of each political party, § 7–8(d), and both serve on a Municipal Central Committee, § 7–8(h). Both choose delegates to state party conventions in an identical manner, § 7–9. Holders of both offices, as members of the County Central Committee, vote concerning nominations for vacancies in county offices, and party convention delegate positions, § 7–9.1.

A signature requirement might indeed reduce voter confusion and minimize the ballot size, thus serving state interests. But it is unclear why realizing these interests requires a ten percent rule in the City of Chicago and only a five percent signature requirement in townships. While defendants have enumerated several state interests furthered by a ten percent signature requirement, the sole justification offered for a disparate requirement between the two offices is the allegation that gathering signatures in townships is more difficult than gathering signatures in the city. This incorrectly assumes that population density is always greater in the city than in townships. Moreover, plaintiffs present evidence from a state representative that gathering signatures in the city is at least as difficult as gathering signatures in townships.

Additionally, there is no evidence that voter confusion and long ballots are a greater problem in Chicago than in townships. In fact, the ten percent rule has operated to exclude all Republican Ward Committeeman candidates from at least one ward. And a list of candidates in the various wards indicates that, at most, five Ward Committeeman candidates will appear on a ballot. This will occur in the race for Democratic Ward Committeeman in the 37th Ward. The damage of excessively long ballots or voter confusion in Chicago hardly seems imminent.

Nor is there evidence that Chicago faces more frivolous candidates than the townships, or a reason for why a modicum of voter support requires a ten percent rule in the city, but only a five percent rule in the suburbs. In fact, rather than eliminating frivolous candidacies and requiring a showing of a modicum of support, the ten percent signature requirement serves to eliminate candidates with demonstrated voter appeal. Some plaintiff candidates have participated in previous elections and some plaintiff candidates presently hold Ward Committeeman positions.[17] We cannot characterize any of these candidates as "frivolous," but they will be excluded from participation in the election as a result of the signature requirement, notwithstanding the fact that they have demonstrated a modicum of support.

■ The disparate signature requirement is especially problematic in light of

---

**16.** Although we have ordered the parties to present affidavits on the "factual dispute" as to the differences of the duties of Ward Committeeman and Township Committeeman, we believe our proper focus should be on the statutory provisions which create these offices and define their duties. The not too surprising possibility that some Township Committeemen as a matter of custom may administer their offices in a different manner than some Ward Committeemen is not really relevant to our inquiry. For this reason, a full evidentiary hearing on this question was not required at this time. *See* section II, *infra.*

**17.** Tillman received 25% of the vote for 3rd Ward Alderman in 1983; she is presently interim alderman in the ward. Eddings received approximately 36% of the vote for 18th Ward Alderman. Gjertsen is acting Republican Ward Committeeman in the 40th Ward and has appeared on the ballot in a variety of races since 1977. Joseph W. Smith was elected as an alternate delegate to the Republican Party's Presidential Nominating Convention in 1980 and was appointed to be 45th Ward Republican Committeeman in 1981. Schell has received votes as a Ward Committeeman candidate in the past. Margalus was appointed acting 11th Ward Republican Committeeman in 1982.

the fact that less burdensome alternatives are open to the state to realize its significant objectives. The examination of less burdensome alternatives is, of course, an important part of the balancing test courts must undertake when confronted with ballot access restrictions. *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 1579, 75 L.Ed.2d 547 (1983). Ill.Rev.Stat. ch. 46, § 7–10(k) determines "primary electors" by taking the total vote cast for the political party's candidate who received the highest number of votes in the ward at the last regular election. Defining "primary electors" according to the number of votes cast in the most recent *primary* election might equally serve the state's interests in avoiding voter confusion, minimizing ballot size, eliminating frivolous candidacies and requiring a showing of modicum of voter support. If this were the rule, rather than being required to submit 1,822 signatures, plaintiff Gjertsen would have had to submit ten percent of 341 votes, only 34 signatures.

Alternatively, candidates could be required to submit signatures representing ten percent of the votes cast in the last Ward Committeeman election. Such a rule would have, as an example, the following effect: Rather than forcing plaintiff Tillman to submit 2,448 signatures, which exceeds the votes cast in the last Ward Committeeman election (2,235), she would have had to submit 224 signatures this year to get on the ballot.

Yet another less burdensome means to reach the state goals might be to eliminate the disparity in the statute and extend the five percent rule for Township Committeeman candidates to Ward Committeeman candidates. The five percent rule presumably achieves the state's interests in townships. Given the similarities between the offices of Township Committeeman and Ward Committeeman, a five percent rule would allow the state to realize its interests, while reducing the burdens Chicago candidates face in appearing on the ballot.

In summary, the state's interests do not warrant the burden that a disparate signature requirement imposes upon plaintiffs' interests.[18] Such a geographical classification, absent some justification, is "contrary to the constitutional theme of equality among citizens in the exercise of political rights." *Moore v. Ogilvie*, 394 U.S. 814, 818–19, 89 S.Ct. 1493, 1496, 23 L.Ed.2d 1 (1969). To limit competition for party offices would undermine the diversity and vigor of our political parties. Moreover, lack of access to the ballot weakens the electoral process, calling into question the very legitimacy of a democratic government. The signature requirement unnecessarily restricts constitutionally protected liberty; the Supreme Court has declared that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 1579, 75 L.Ed.2d 547 (1983), citing *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). Defendants' efforts to rationalize a justification for the 10% signature requirement is woefully weak. Political office should be reasonably accessible to potential candidates. This

---

**18.** As we have previously observed, the State Board claims that the signature requirement serves the interests of political parties in assuring that candidates elected to party office are "truly representative" of party views. Political parties surely enjoy a constitutionally protected right of political association. *Cousins v. Wigoda,* 419 U.S. 477, 487, 95 S.Ct. 541, 547, 42 L.Ed.2d 595 (1975). This includes the freedom to identify the people who constitute the association and to limit the association to those people only. *Democratic Party of the United States v. Wisconsin,* 450 U.S. 107, 122, 101 S.Ct. 1011, 1019, 67 L.Ed.2d 82 (1981); *Suter v. Libertarian Party of Illinois,* No. 83 C 6047 at 6 (N.D.Ill. Feb. 9, 1984). But the state's position misapprehends the political process. We initially note that the decision as to whether a particular candidate on a ballot is "truly representative" of party views is a matter best left to voters. Thus, insofar as the signature requirement prevents voters from choosing the candidate who they feel is truly representative of party views, it impedes rather than serves the above interest. No explanation for a disparate signature requirement, moreover, has been offered. There is no evidence that Ward Committeeman elections, as opposed to Township Comitteeman elections, attract more candidates who might not truly represent party views.

serves both the potential candidates and the voters who are afforded wider leadership choices. It is clearly in the interest of a free society to promote, rather than chill, political challenge. The 10% signature requirement serves only the entrenched incumbent. Accordingly, we hold that Ill. Rev.Stat. ch. 46, § 7–10(i), which requires candidates to submit signatures representing ten percent of the primary electors of their party in their wards, is unconstitutional.

## VII.

Finally, we turn to the fashioning of an appropriate remedy. Plaintiffs seek an order enjoining defendants to place their names on the ballot in the upcoming election. Defendants, however, have contended, and plaintiffs have not disputed, that awarding such of relief will be costly and administratively difficult.

Courts have fashioned a variety of remedies in election cases. A district court has broad powers to fashion an appropriate remedy when ballot restrictions have been found to violate the Equal Protection Clause. *Sangmeister v. Woodard*, 565 F.2d 460, 468 (7th Cir.1977), *cert. denied*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1978). For example, the Court in *Gilmore v. The Greene County Democratic Party Executive Committee*, 368 F.2d 328 (5th Cir.1966), held that certificates of nomination filed by two candidates were valid. But because a proper ballot could not be prepared in time for the election, the Court stayed the election. *Id.* at 329. Ordering the placement of candidates' names on the ballot is yet another possible remedy, *McCarthy v. Briscoe*, 429 U.S. 1317, 97 S.Ct. 10, 50 L.Ed.2d 49 (Powell, Circuit Justice 1976); *Williams v. Rhodes*, 89 S.Ct. 1, 21 L.Ed.2d 69 (Stewart, Circuit Justice 1968). Other courts have declined to order that a candidate's name be placed on the ballot prior to an election but have permanently enjoined the enforcement of a signature requirement. *E.g., Greaves v. State Board of Elections of North Carolina*, 508 F.Supp. 78 (E.D.N.C.1980).

We have held that a disparate signature requirement unconstitutionally denies plaintiffs the equal protection of the laws. A five percent requirement, in our view, represents a less burdensome alternative means for the state to reach its important goals. We therefore order defendants to place on the ballot any of the named plaintiffs who have submitted signatures equaling five percent or more of the primary electors of their party in their wards. Plaintiffs Dorothy Tillman, George H. Eddings and Joseph W. Smith each submitted signatures exceeding five percent of the primary electors in their wards. Edward W. Gjertsen and Herman A. Schell, Jr. failed to submit five percent; evidence in the record does not indicate whether William T. Margalus exceeded five percent.

For these reasons set forth in this opinion, plaintiffs' motion for a preliminary injunction in 84 C 0184 has been granted, and plaintiffs' motion for a preliminary injunction in 84 C 0560 has been granted in part and denied in part. Defendants are enjoined to certify for placement on the ballot, and to place on the ballot, plaintiffs Dorothy Tillman, George H. Eddings and Joseph W. Smith. In the event that five percent or more of the signatures remaining on Margalus' nomination petitions withstood challenges from objectors, defendants are enjoined to certify his name for placement on the ballot, and to place his name on the ballot. We are not unmindful of the expense and administrative difficulties that such relief might engender. Therefore, if defendants cannot feasibly grant the above relief for the March 20, 1984 election, they are ordered to postpone the March 20, 1984 election for Ward Committeeman in these plaintiffs' wards for a reasonable period of time.

Some aspects of this case are yet to be resolved. However, in light of this opinion, a simple legislative resolution might be in the best interests of all parties. In this regard, a status hearing is set in open court on April 20, 1984, at 11:00 a.m. It is so ordered.